UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  February 10, 2017

JAMES ANGLIM,

                           Petitioner,

               v.

THE VERTICAL GROUP,

                        Respondent.

------------------------------------------------------X

16 Civ. 3269 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Petitioner James Anglim, a former penny-stock trader for Respondent The Vertical Group ("Vertical"), seeks to confirm, vacate, and modify an arbitration award (the "Award"). In the underlying arbitration (the "Arbitration"), Petitioner alleged that Respondent unlawfully withheld a portion of his wages in a reserve fund (the "Reserve"), then failed to return that money when Petitioner left Respondent's employ. Petitioner sought recovery under Sections 191 and 193 of the New York Labor Law (the "NYLL"), N.Y. Lab. Law §§ 191 and 193, as well as equitable theories of quantum meruit, unjust enrichment, and restitution.

The Award, issued by a three-member Financial Industry Regulatory Authority ("FINRA") panel (the "Panel") in February 2016, has two parts. Section 1 granted Petitioner $50,000 in compensatory damages. The parties do not quibble over that figure, and Petitioner seeks to confirm this part of the Award under Section 9 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 9.

Petitioner insists, however, that Section 2 of the Award — which denied him all other relief — is erroneous, because he was entitled to attorney's fees under Section 198 of the NYLL, N.Y. Lab. Law § 198.  In consequence, Petitioner urges the Court to (i) vacate Section 2 of the Award under Section 10 of the FAA, 9 U.S.C. § 10, then (ii) modify it under Section 11 of the FAA, 9 U.S.C. § 11, in order to award Petitioner attorney's fees.  Respondent retorts that Petitioner's request for vacatur is untimely and, in any event, meritless.

Respondent has the better arguments.  Petitioner's application to vacate the Award is untimely under Section 12 of the FAA, 9 U.S.C. § 12.  And it falls short of the high bar Petitioner must meet in order to demonstrate that vacatur is warranted.  Thus, for the reasons set forth below, Petitioner's petition (the "Petition") is granted in part and denied in part, and the Award is confirmed in its entirety.

## BACKGROUND[1]

Petitioner's argument for vacating Section 2 of the Award rests on the following syllogism:  Section 198 of the NYLL mandates that an employee who

---

[1]     This Opinion draws on facts from the Petition ("Pet." (Dkt. #1-2)); the memorandum Petitioner submitted in support of his Petition ("Pet'r Mem." (Dkt. #1-3)); the Declaration of Sandra P. Lahens in support of the Petition ("Lahens Decl." (Dkt. #1-5)); the Affirmation of Sandra P. Lahens supporting Petitioner's motion for summary judgment ("Lahens Aff." (Dkt. #15)) and the exhibits attached thereto ("Lahens Aff., Ex. [ ]"); Petitioner's Statement of Material Facts submitted pursuant to Local Civil Rule 56.1 ("Pet'r 56.1" (Dkt. #17)); the Affirmation of John Murphy in support of Respondent's motion for summary judgment ("Murphy Aff." (Dkt. #20)) and the exhibits attached thereto ("Murphy Aff., Ex. [ ]"); and Respondent's response to Petitioner's Local Civil Rule 56.1 Statement of Material Facts ("Resp't 56.1" (Dkt. #24)).  On July 29, 2016, Respondent mailed to the Court a letter enclosing a CD with transcripts from three days of the Arbitration.  The Court will cite those transcripts as:  "1/14/16 Tr."; "1/15/16 Tr."; and "1/21/16 Tr."  Finally, for ease of reference, the Court refers to Petitioner's opening brief as "Pet'r Br.," to Respondent's opposition brief as "Resp't Opp.," and to Petitioner's reply as "Pet'r Reply."

prevails on an NYLL claim "shall [be] allow[ed] … to recover … [his] reasonable attorney's fees."  N.Y. Lab. Law § 198(1-a).  In Section 1 of the Award, Petitioner insists, the Panel concluded that Respondent violated the NYLL, and accordingly awarded Petitioner damages, *viz.*, $50,000 from the Reserve.  Thus, Petitioner argues, the Panel was *required* to award Petitioner attorney's fees, and by refusing to do so the Panel "manifestly disregarded" Section 198 of the NYLL.

This introduction makes plain that a key aspect of this case is understanding Petitioner's employment with Respondent in light of the NYLL's statutory framework.  To this end, the Court will begin by reviewing the terms and nature of Petitioner's work and compensation with an eye towards Petitioner's Reserve.  Then, the Court will consider the arguments the parties pressed during the Arbitration.  And consistent with its obligation to treat the Petition "as akin to a motion for summary judgment," *Salzman* v. *KCD Fin., Inc.*, No. 11 Civ. 5865 (DLC), 2011 WL 6778499, at *2-3 (S.D.N.Y. Dec. 21, 2011) (internal quotation mark omitted) (quoting *City of N.Y.* v. *Mickalis Pawn Shop, LLC,* 645 F.3d 114, 136 (2d Cir. 2011)), the Court will note where the parties dispute material facts.

A.     **Factual Background**

1.     **Petitioner's Employment with Respondent**

Petitioner worked "as an institutional equities trader and salesman" for Respondent, which is based in New York City, between 2005 and 2013.  (Pet'r Mem. 5; Pet'r Rule 56.1 ¶¶ 1-2).  Throughout this period, Petitioner was

3

compensated on a commissions-only basis.  (Pet'r 56.1 ¶ 3).  He was compensated well:  During Petitioner's final year of employment, 2013, Respondent paid him $1,458,211.  (Murphy Aff., Ex. Y).

Petitioner never had a written employment agreement with Respondent. (*See, e.g.*, 1/14/16 Tr. 40).  Indeed, the absence of written documentation would seem to be a hallmark of the parties' relationship.  The parties did not reach a written agreement when, for example, Petitioner decided to work remotely from Las Vegas, Nevada.  (1/15/16 Tr. 77).  Nor did they write up agreements when Petitioner's commissions percentage increased from 35 percent to 45 percent, or from 45 percent to 50 percent.  (*Id.* at 76, 93).  And most critically for the purposes of the instant motion, there exists no written agreement explaining clearly how Respondent structured Petitioner's Reserve. (*See id.* at 55-56; Pet. 2-3).

Respondent opened Petitioner's Reserve in 2007, following an inquiry from the Securities and Exchange Commission and the Department of Justice into accounts for which Petitioner was the registered representative.  (1/14/16 Tr. 165-68; 1/15/16 Tr. 32).  Petitioner agreed to "share[] in the legal fees" for this investigation.  (1/15/16 Tr. 33).  But the purposes for which Respondent could use the funds in the Reserve, and the source from which Respondent deducted those funds, are matters the parties debate hotly.

Petitioner's take on the Reserve is as follows:  Starting in 2007, Respondent withheld money "from Petitioner's wages" in order to build up the Reserve, which was intended to be used "to cover [Petitioner's] trading losses."

4

(Pet. 2; Pet'r 56.1 ¶ 6).  Put another way:  Respondent deducted money from Petitioner's *commissions* and kept it in the Reserve.  (Pet. 2).  The size of the Reserve increased substantially throughout Petitioner's employment with Respondent — from $5,000 in 2007 to $150,000 by the time Petitioner left the firm.  (Murphy Aff., Ex. F, L).  There are no written agreements memorializing these increases to Petitioner's Reserve.  (1/15/16 Tr. 75-76).  However, in May 2010, Respondent's then-Chief Executive Officer ("CEO") Robert Schaffer sent a letter to Petitioner confirming that Respondent had retained "cash reserves against [Petitioner's] trading account," and that Respondent had withheld this money "from [Petitioner's] net payout."  (Murphy Aff., Ex. N).

Respondent offers a different interpretation of the Reserve.  The money in the Reserve, Respondent maintains, was not withheld from Petitioner's wages.  (Resp't 56.1 ¶ 6).  Rather, Respondent posits that this money was withheld from the *total revenue* Petitioner generated for Respondent, from which Respondent deducted "the costs and expenses associated with [Petitioner's] trading activities."  (Resp't Opp. 2-3).  Respondent thus argues that Petitioner's commissions — i.e., his wages — were calculated *after* Respondent made these deductions, including the Reserve deductions.  (Resp't 56.1 ¶ 3).

Although Petitioner had no employment contract with Respondent, he did receive monthly profit-and-loss statements that reference the Reserve.  Petitioner's January 2013 statement, for example, indicates that in that month Petitioner's "Net Pay" was $248,000.  (Murphy Aff., Ex. L).  Respondent arrived at that figure by first calculating Petitioner's "Net Payout," which was the sum

of Petitioner's gross profit and loss, multiplied by the percentage of commissions he drew from that profit and loss, less certain expenses and sales credits. (*Id.*). From Petitioner's Net Payout — which for January 2013 was $260,573 — Respondent deducted additional expenses, such as Petitioner's monthly dental- and medical-insurance premiums. (*Id.*). Included in this latter category of "below-the-line" deductions is the Reserve: In January 2013, Respondent made no deductions to bolster Petitioner's Reserve, which at that point held $150,000. (*Id.*). When Petitioner left Respondent in October 2013, the Reserve's balance stood at $150,000. (Pet'r 56.1 ¶¶ 10-11).

### 2. The Arbitration

On December 12, 2013, Petitioner filed with FINRA a Statement of Claim. (Murphy Aff., Ex. A). Petitioner alleged that Respondent had "unilaterally deducted from his earned wages and/or commissions to fund" the Reserve. (*Id.* at 1). Petitioner contended that those deductions, and Respondent's failure to return the funds in the Reserve to Petitioner, violated Sections 191 and 193 of the NYLL. (*Id.* at 4-7). And Petitioner argued that under Section 198 of the NYLL, he was entitled to recover his attorney's fees. (*Id.* at 7). In addition to pursuing relief under the NYLL, Petitioner brought claims for "unjust enrichment and/or restitution" and quantum meruit. (*Id.* at 8-9).[2]

---

[2]     In its Answer to Petitioner's Statement of Claim, Respondent raised several counterclaims. (Pet'r 56.1 ¶ 15). Respondent withdrew or settled all of these counterclaims before the Arbitration concluded (*id.*; Murphy Aff., Ex. C), and accordingly the Court will not address them further.

On the eve of the Arbitration, Petitioner appeared to be focusing more intently on his NYLL claims than his claims for equitable relief.  His January 6, 2016 Amended Pre-Hearing Brief did not raise unjust enrichment, restitution, or quantum meruit claims.  (Lahens Aff., Ex. O).  But Petitioner also clarified that that brief was "not meant to be an exhaustive recitation of the … legal precepts which may be applicable to the issues in [his] case."  (*Id.* at 1).

The Arbitration began the week of January 11, 2016.  (Resp't 56.1 ¶ 16).  During his opening statement and closing argument, Petitioner gave to the Panel printed copies of the NYLL provisions that he believed Respondent had violated, as well as copies of NYLL Section 198.  (*Id.* at ¶ 17).

One cornerstone of Respondent's case was that the Reserve did not consist of deductions taken from Petitioner's wages.  To this end, on January 15, 2016, Respondent moved for a partial directed verdict dismissing Petitioner's NYLL claims.  (1/15/16 Tr. 126-28; Resp't Opp. 16 n.6).  Respondent argued that Petitioner's claim for compensatory damages boiled down to his belief that Respondent had breached an agreement between the parties.  (1/15/16 Tr. 127-28).  But that argument, Respondent contended, was substantively distinct from a claim that Respondent had violated the NYLL.  (*Id.*).  One of the three members of the Panel couched Respondent's oral motion as an argument "that the labor law [did] not apply."  (*Id.* at 128).  The Panel denied Respondent's motion, but agreed to "take it into consideration at the end" of the Arbitration.  (*Id.* at 129).

One data point about the Reserve merits attention here.  On April 26, 2010, Respondent received from FINRA a letter seeking, among other things, information about Respondent's supervisory procedures.  (Murphy Aff., Ex. P).  Among the categories of information FINRA sought was "[a] list of the individual[s] who supervise[d] [Respondent] and a list of [Respondent's] clients."  (*Id.*).  That investigation concluded in December 2013, when Respondent executed a "Letter of Acceptance, Waiver and Consent" in which it agreed to pay FINRA a $400,000 fine.  (*Id.* at Ex. V).

During the Arbitration, Schaffer and Thomas Martin (who at that point was Respondent's CEO) testified that when Petitioner left the firm, they had both expected that Petitioner "would contribute $100,000" of the money in his Reserve to pay this fine.  (1/14/16 Tr. 30-31, 48-49, 197).  Here again, there is no written agreement memorializing Respondent's understanding that Petitioner would make this contribution.  (*Id.* at 197-98).  Rather, Martin testified that Petitioner and Respondent had reached an oral agreement pursuant to which Petitioner would pay a proportional share "of what the ultimate fine was."  (*Id.* at 198).  Petitioner, in contrast, does not believe that he agreed to contribute towards the fine.  (1/15/16 Tr. 38-39).

The parties' closing arguments to the FINRA Panel on January 21, 2016, tracked many of the arguments they have raised before this Court.  Petitioner insisted that he had stated a claim for relief under the NYLL.  (1/21/16 Tr. 69-71).  And Section 198 of the NYLL, Petitioner claimed, required the Panel to award Petitioner both attorney's fees and liquidated damages.  (*Id.* at 126).  All

8

told, Petitioner requested $545,014, a figure that included compensatory damages, interest, liquidated damages, and $146,292 in attorney's fees and costs. (Lahens Aff., Ex. P). Respondent countered that its deductions to build the Reserve did not violate the NYLL, and that the statute was thus flatly inapplicable. (1/21/16 Tr. 26-35).

The Panel issued the Award on either February 2 or February 3, 2016 — a discrepancy the parties dispute, and which the Court will explore more fully *infra*. (*Compare* Pet'r 56.1 ¶ 16 (February 3), *with* Resp't 56.1 ¶ 16 (February 2)). A section of the Award entitled "Case Summary" provides that Petitioner had sought recovery under the NYLL and theories of "unjust enrichment and/or restitution, and quantum meruit." (Murphy Aff., Ex. C). As for damages, Section 1 of the Award ordered Respondent to pay Petitioner "compensatory damages in the amount of $50,000.00 plus interest at the rate of 9% per annum from December 12, 2013 until January 15, 2016." (*Id.*). Section 1 does not disclose the grounds on which the Panel awarded this relief. Indeed, at no point in the Award did the Panel explain the legal basis for its $50,000 damages calculation. Section 2 of the Award added: "Any and all relief not specifically addressed herein is denied." (*Id.*).

## B.    Procedural Background

Petitioner filed his Petition to confirm, vacate, and modify the Award on May 2, 2016. (Dkt. #1). On May 3, Petitioner served the Petition on the attorney who had represented Respondent during the Arbitration — who by

that date was no longer Respondent's counsel.  (Dkt. #6; *see* Murphy Aff.,

Ex. E).

On May 11, 2016, this Court issued an Order directing Petitioner to

"move for confirmation, vacation, or modification of the [Award] in the form of a

motion for summary judgment."  (Dkt. #7).  Petitioner filed his motion for

summary judgment and supporting papers on May 23, 2016.  (Dkt. #9).[3]

Respondent filed its opposition papers on July 15, 2016 (Dkt. #20-24), and

briefing concluded when Petitioner submitted his reply on July 28, 2016

(Dkt. #25).

## DISCUSSION

### A.   Applicable Law

Two principles guide the Court's analysis in this Opinion.  The first is

"that district courts should … treat a petitioner's application to confirm or

vacate an arbitral award as 'akin to a motion for summary judgment.'"

*Mickalis Pawn Shop, LLC*, 645 F.3d at 136 (quoting *D.H. Blair & Co.* v.

*Gottdiener,* 462 F.3d 95, 109 (2d Cir. 2006)).  The second is that this Court

owes "strong deference … [to] arbitral awards and the arbitral process, and has

limited its review of arbitration awards in obeisance to that process."  *N.Y. City

Dist. Council of Carpenters* v. *WJL Equities Corp.*, No. 15 Civ. 4560 (KPF), 2015

---

[3]      It appears that Respondent's May 23, 2016 submission did not comply with this Court's
procedures for electronic filing.  (*See* Dkt. #9).  Respondent also encountered docketing
problems when he attempted to remediate this error by re-filing his summary-judgment
papers on May 26, 2016.  (Dkt. #11, 12).  Respondent's June 2, 2016 submissions,
however, appear to have been filed without incident, and in this Opinion the Court has
cited the documents that Respondent filed on that date.

WL 7571835, at *2 (S.D.N.Y. Nov. 24, 2015) (internal quotation mark omitted) (quoting *Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007)).  The Court considers each principle in turn.

### 1.    Motions for Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To discharge this burden, a summary-judgment movant "bears the initial responsibility of ... demonstrat[ing] the absence of a genuine issue of material fact."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986).  "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion."  *Figueroa* v. *Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If a movant makes this showing, the non-movant "must 'set forth specific facts demonstrating that there is a genuine issue for trial,' and cannot 'merely rest on the allegations or denials' contained in the pleadings."  *Trustees for the Mason Tenders Dist. Council Welfare Fund, Pension Fund, Annuity Fund, and Training Program Fund and Bonanza* v. *YES Restoration*, No. 14 Civ. 8536 (KPF), 2015 WL 3822764, at *3 (S.D.N.Y. June 19, 2015) (quoting *Wright* v. *Goord,* 554 F.3d 255, 266 (2d Cir. 2009)).

"A court reviewing a motion for summary judgment must 'construe the facts in the light most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the movant.'"  *Beyer* v. *Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Dallas Aerospace, Inc.* v. *CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir. 2003)).

### 2.   Judicial Review of Arbitration Awards

"When reviewing an arbitration award, 'courts must grant an arbitration panel's decision great deference.'"  *Trina Solar US, Inc.* v. *JRC-Servs. LLC*, No. 16 Civ. 2869 (VEC), 2017 WL 187476, at *4 (S.D.N.Y. Jan. 17, 2017) (quoting *Wallace* v. *Buttar*, 378 F.3d 182, 189 (2d Cir. 2004)).  That deference circumscribes narrowly this Court's ability to disturb an arbitration award.

"Confirmation of an arbitration award is generally 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected.'"  *YES Restoration*, 2015 WL 3822764, at *3 (quoting *D.H. Blair,* 462 F.3d at 110).  "Courts in this [C]ircuit will ... vacate an arbitration award only upon finding a violation of one of the four statutory bases" that Section 10 of the FAA lists "or, more rarely, if [the court] find[s] a panel has acted in manifest disregard of the law."  *Hagan* v. *Katz Commc'ns, Inc.*, No. 12 Civ. 5987 (RA), 2016 WL 4147194, at *3 (S.D.N.Y. Aug. 3, 2016) (internal quotation marks omitted) (quoting *Porzig*, 497 F.3d at 139).

The construct of "manifest disregard of the law" is "judicial gloss on the[] specific grounds for vacatur" that the FAA enumerates.  *Schwartz* v. *Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011) (quoting *T.Co Metals, LLC* v. *Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010)); *accord Doscher*

v. *Sea Port Grp. Sec., LLC*, 832 F.3d 372, 375 n.3 (2d Cir. 2016).  "To vacate an award on the basis of a manifest disregard of the law, the court must find 'something beyond and different from mere error in the law or failure on the part of the arbitrators to understand or apply the law.'"  *Jock* v. *Sterling Jewelers Inc.*, 646 F.3d 113, 121 n.1 (2d Cir. 2011) (quoting *Westerbeke Corp.* v. *Daihatsu Motor Co.*, 304 F.3d 200, 208 (2d Cir. 2002)).

Thus, a party seeking to vacate an award based on manifest disregard of the law must make two showings:  (i) that "the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable," and (ii) that "the arbitrator knew about 'the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it.'"  *Jock*, 646 F.3d at 122 n.1 (internal quotation mark omitted) (quoting *Westerbeke*, 304 F.3d at 209).  "A mere demonstration that an arbitration panel made 'the wrong call on the law' does not show manifest disregard," and an arbitration "award should be enforced ... if there is a *barely colorable justification* for the outcome reached."  *Telenor Mobile Commc'ns AS* v. *Storm LLC*, 584 F.3d 396, 407 (2d Cir. 2009) (internal quotation mark omitted) (quoting *Buttar,* 378 F.3d at 190) (emphasis in *Buttar*).

**B.    Analysis**

To review, Petitioner seeks to confirm, vacate, and modify the Award.  These requests are all related.  This Court's default position is to confirm the Award.  *YES Restoration*, 2015 WL 3822764, at *3.  It will deviate from that position only if there is a reason to vacate, modify, or correct the Award.  *Id.*

13

Neither Petitioner nor Respondent takes issue with Section 1 of the Award, which granted Petitioner $50,000 in compensatory damages.  But Petitioner argues that the Panel manifestly disregarded Section 198 of the NYLL when it denied his request for attorney's fees.  For that reason, Petitioner urges the Court to vacate and modify Section 2 of the Award.

This, the Court will not do.  Respondent is correct in its contentions that Petitioner's request for vacatur is untimely and flawed on the merits.[4] Petitioner did not serve his Petition within three months of the date the Panel delivered the Award to the parties, as 9 U.S.C. § 12 commands.  And even if Petitioner had timely served the Petition, it would fail on its merits, because Petitioner has not demonstrated that the Panel manifestly disregarded the law. Accordingly, the Court denies Petitioner's request for vacatur, and confirms the Award in full.

---

[4]   Respondent also presses a third argument:  that "'manifest disregard of the law' … no longer remains a valid ground to modify an arbitration award." (Resp't Opp. 23).  It is true that *Hall Street Associates, L.L.C.* v. *Mattel, Inc.* held that Sections 10 and 11 of the FAA "respectively provide the FAA's exclusive grounds for" vacating and modifying an arbitration award.  552 U.S. 576, 584, 590 (2008).  And the Second Circuit has recognized that *Hall Street* "placed the proper scope of the manifest disregard doctrine into some doubt."  *Schwartz*, 665 F.3d at 451 (quoting *T.Co*, 592 F.3d at 339).  But the Supreme Court's 2010 decision in *Stolt-Nielsen S.A.* v. *AnimalFeeds International Corp.* explicitly declined to answer the question "whether 'manifest disregard' survives … *Hall Street* … as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10."  559 U.S. 662, 672 n.3 (2010). Following this cue, the Second Circuit has affirmed the continuing vitality of the manifest disregard doctrine in recent opinions.  *See, e.g., Doscher* v. *Sea Port Grp. Sec., LLC*, 832 F.3d 372, 375 n.3 (2d Cir. 2016).  Accordingly, and consistent with binding Second Circuit authority, the Court proceeds on the assumption that manifest disregard remains a valid ground for vacating an arbitral award.

1.      **Petitioner's Request for Vacatur Is Denied**

     a.      **Petitioner Did Not Serve His Petition Within Three Months of the Date on Which the Panel Delivered the Award**

Under Section 12 of the FAA, "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."   9 U.S.C. § 12.[5] Respondent argues that Petitioner failed to abide by this timeline:  He served the Petition on May 3, 2016 — three months and one day after February 2, 2016, the date the Panel issued the Award.  (Resp't Opp. 19-21).  Petitioner tries to resist this conclusion in several ways, chief among them by claiming that the Panel issued the Award on February 3, not February 2.  (Pet'r Reply 10).  The record confirms, however, that any factual dispute between the parties is more apparent than real, and that the Petition is indeed untimely.

Before delving into the facts, a few notes about Section 12's temporal requirement are warranted.  The statute's three-month time limit for service is absolute:  "No exception to [the] three month limitations period is mentioned in

---

[5]      Section 12 goes on:  "If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court."  9 U.S.C. § 12.  In addition to arguing that Petitioner failed to serve the Petition within Section 12's three-month window, Respondent contends that Petitioner failed to serve the Petition on Respondent or its attorney.  (Resp't Opp. 20-21).  Petitioner, Respondent notes, served the Petition on Respondent's counsel from the Arbitration, who (apparently unknown to Petitioner) stopped representing Respondent months before the instant case commenced.  This argument — unsupported by any legal authority in Respondent's brief — strikes the Court as too clever by half.  More importantly, it is irrelevant.  Even if Petitioner had served the Petition "upon [Respondent] or [its] attorney" in accordance with Section 12, that service would have been untimely. Accordingly, the Court will assume without deciding that Petitioner served the Petition on an individual entitled to accept service under Section 12.

[9 U.S.C. § 12]. Thus, under its terms, a party may not raise a motion to vacate, modify, or correct an arbitration award after the three month period has run[.]" *DeGrate* v. *Broad. Music, Inc.*, No. 12 Civ. 1700 (RJS) (JLC), 2013 WL 639146, at *3 (S.D.N.Y. Feb. 20, 2013) (quoting *Florasynth, Inc.* v. *Pickholz,* 750 F.2d 171, 175 (2d Cir. 1984)); *accord Barclays Capital Inc.* v. *Hache,* No. 16 Civ. 315 (LGS), 2016 WL 3884706, at *2 (S.D.N.Y. July 12, 2016) ("[T]he three-month deadline contained in 9 U.S.C. § 12 is not subject to extension.").

Section 12's clock starts ticking the same day that an arbitration "award is delivered [or filed], not the day after." *Triomphe Partners, Inc.* v. *Realogy Corp.*, No. 10 Civ. 8248 (PKC), 2011 WL 3586161, at *2 (S.D.N.Y. Aug. 15, 2011), *on reconsideration in part*, No. 10 Civ. 8248 (PKC), 2012 WL 266890 (S.D.N.Y. Jan. 30, 2012). That is because Federal Rule of Civil Procedure 6(a)(1)(A) — which provides that "in computing any time period specified in" the Rules, courts should "exclude the day of the event that triggers the period" — "does not apply to [Section 12's] limitation period." *Id.*; *see* Fed. R. Civ. P. 81(a)(6)(B) (Federal Rules of Civil Procedure govern arbitration proceedings under the FAA, except where FAA "provide[s] other procedures"). And because an "action to enforce an arbitration award is a creature of statute," "there is no common law exception to [Section 12's] three month limitations period." *Pickholz*, 750 F.2d at 175. All this should make plain that Section 12's three-month "limitation period is strictly construed." *Triomphe Partners*, 2011 WL 3586161, at *2 (holding that petition to vacate "served three months and one day after delivery of the award … [was] untimely"); *Waveform*

16

*Telemedia, Inc.* v. *Panorama Weather N. Am.*, No. 06 Civ. 5270 (CM) (MDF), 2007 WL 678731, at *5 (S.D.N.Y. Mar. 2, 2007) (reaching same result where cross-petition to vacate award was served three months and three days after cross-petitioner received award).

Petitioner served the Petition — which sought confirmation, vacatur, and modification of the Award — on May 3, 2016.  (Dkt. #6).  If the Panel delivered the Award to the parties on February 3, 2016, as Petitioner insists it did, that service was timely.  But if the Panel instead delivered the Award on February 2, 2016, as Respondent maintains, then that service was untimely by one day.

The record overwhelmingly supports Respondent's position.  Respondent argues that "[n]otice of the [A]ward and the [A]ward itself [were] first sent by e-mail message by FINRA to the parties[] on February 2, 2016."  (Resp't 56.1 ¶ 16).  This version of the Award "was signed by two of the three arbitrators" on the Panel, which Respondent contends "was sufficient to make the [A]ward binding on the parties."  (*Id.*).  Respondent adds that FINRA sent another e-mail to the parties on February 3, 2016 — but that e-mail "simply added an additional page containing the signature o[f] the third arbitrator who ha[d] previously signed the [A]ward."  (*Id.*).

The Award itself accords with Respondent's timeline.  Respondent has submitted as a single exhibit (i) a letter enclosing the Award; (ii) a second letter informing Respondent of its obligation to make payment on the Award "within 30 days of" receiving it; and (iii) a copy of the Award attaching two signature pages, each bearing the signature of one of the three Panel members.  (Murphy

Aff., Ex. C).  Respondent's counsel from the Arbitration avers that he received all three of these documents in FINRA's February 2, 2016 e-mail.  (*Id.* at ¶ 5). The first enclosure letter is dated February 2, 2016.  (*Id.* at Ex. C).  The second letter concerning payment of the Award is dated February 2, 2016.  (*Id.*).  And both signature pages attached to the Award indicate that the Award's "Date of Service" was February 2, 2016.  (*Id.*).

In contrast, Petitioner has offered conflicting accounts of the Award's timing with no substantiation for his current position.  In a declaration attached to the Petition (which, somewhat tellingly, is dated May 2, 2016), one of Petitioner's attorneys, Sandra Lahens, averred that the Award "was served on Petitioner and [Respondent], by FINRA, on February 2, 2016."  (Lahens Decl. ¶ 3).  In later submissions, Petitioner appears to retreat from this position, and he now maintains that he did not receive the Award until February 3, 2016.  (Pet'r 56.1 ¶ 16; Pet'r Br. 2, 10; Pet'r Reply 10).  Even here, however, Petitioner is very careful in what he claims.  In his Rule 56.1 Statement submitted in connection with this motion, Petitioner states that "[o]n February 3, 2016, a *three member* FINRA Panel issued an Award."  (Pet'r 56.1 ¶ 16 (emphasis added)).  This statement, however, cites to a new affirmation from Petitioner's counsel in which she makes no mention of the Award's date. (*Id.*; *see* Lahens Aff. ¶ 3).

Petitioner's reference to "a three member FINRA Panel" seems to align with an argument he raises in his reply brief:  that under the FAA, New York

18

Civil Practice Law and Rules ("C.P.L.R.") § 7507, and FINRA Rule 12904(e),[6] the Award was not "delivered" until all three members of the Panel signed it.  (Pet'r Reply 1, 10).  Petitioner appears to argue that the Award was not "filed or delivered" within the meaning of Section 12 until February 3, when FINRA delivered to the parties a version of the Award that bore all three Panel members' signatures.  And in so doing, Petitioner ignores Respondent's claim that FINRA first e-mailed the parties on February 2.

Petitioner's decision to address only obliquely the issue of the date on which he received the Award does not distract the Court from the dearth of evidence substantiating his claim that the Panel delivered the Award on February 3, 2016.  Apart from conclusory statements in Petitioner's pleadings, the only suggestion that the Panel e-mailed some variant of the Award on February 3 and not February 2 is a clarifying statement in *Respondent*'s Local Rule 56.1 Statement.  (Resp't 56.1 ¶ 16).  Put simply, the date on which the Panel issued the Award may be a "material" fact, but there is here no "genuine" dispute concerning that fact.  *See Figueroa*, 825 F.3d at 98.  The Court concludes that a copy of the Award bearing two arbitrators' signatures was

---

6      The Court assumes that Petitioner's citation to FINRA Rule 12904, which governs "customer disputes," is erroneous, and that he meant to cite to FINRA Rule 13904, which applies in "industry disputes."  *Compare* FINRA, RULE 12904, http://finra.complinet.com/en/display/display.html?rbid=2403&element_id=4192 ["FINRA Rule 12904"], *with* FINRA, RULE 13904, http://finra.complinet.com/en/display/display_main.html?rbid=2403&record_id=11410 ["FINRA Rule 13904"].

"filed or delivered" on February 2, 2016.  That means that Petitioner's service of the Award on May 3, 2016, was untimely by one day.

Petitioner's legal argument that the Award was not "delivered" until all three arbitrators signed fails on the merits.  FINRA Rule 13904(a) states that "[a]ll awards shall be in writing and signed by *a majority of the arbitrators* or as required by applicable law."  FINRA Rule 13904(a) (emphasis added).  Petitioner claims, without elaboration, that the FAA (he does not identify a specific subsection) and C.P.L.R. § 7507 require that an arbitration award be signed by every member of the panel that rendered it.  But C.P.L.R. § 7507 provides only that an arbitration "award shall be … signed and affirmed by the arbitrator making it."  N.Y. C.P.L.R. § 7507.  That statute says nothing about signature requirements where a multi-member panel has issued an arbitration award, and the Court has found no case law justifying Petitioner's unsupported claim that it does.  Similarly, the FAA does not by its terms impose the "all signatures" requirement Petitioner ascribes to it.

Ultimately, the Court finds that Petitioner did not serve the Petition within 9 U.S.C. § 12's limitation period.  For this reason, the Court denies the Petition insofar as it requests vacatur and modification of the Award.

### b.    Petitioner's Request for Vacatur Is Meritless

Even if Petitioner had timely served the Petition, this Court would not vacate Section 2 of the Award.  Petitioner argues that the Panel manifestly disregarded NYLL Section 198 by denying his request for attorney's fees.  (Pet'r Br. 11-14).  But after reviewing the Award and the record of the Arbitration, the

Court cannot conclude that the Panel erred, and certainly not to an egregious degree, in refusing to award Petitioner attorney's fees.

Petitioner has woven a tenuous set of inferences into an argument for vacatur. The Award does not disclose the legal basis for the Panel's decision, in Section 1, to award Petitioner $50,000 in compensatory damages. Petitioner, however, insists that the Panel "found for Petitioner on his claim for unpaid wages under" the NYLL. (Pet'r Br. 14). Implicit in that assumption is an antecedent conclusion: the Panel determined that Respondent built up Petitioner's Reserve by making unlawful deductions from Petitioner's wages. Otherwise, Petitioner would not be entitled to damages under Sections 191 and 193 of the NYLL, which respectively impose requirements for the timing of wage payments and deductions therefrom. N.Y. Lab. Law §§ 191, 193.

Embroidered on these arguments is Petitioner's belief that the Panel rejected his quantum meruit, restitution, and unjust enrichment causes of action. And to reach this conclusion, Petitioner posits, the Panel must have determined that Petitioner and Respondent had a binding agreement regarding the Reserve, because in New York "[t]he existence of an express agreement, whether oral or written, governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter." *A. Montilli Plumbing & Heating Corp.* v. *Valentino*, 935 N.Y.S.2d 647, 649 (App. Div. 2d Dep't 2011) (citation omitted).

These arguments unravel under scrutiny. To demonstrate that the Panel manifestly disregarded the law, Petitioner must establish (i) that "the governing

law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable," and (ii) that "the arbitrator[s] knew about 'the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it.'" *Jock*, 646 F.3d at 122 n.1 (internal quotation mark omitted) (quoting *Westerbeke*, 304 F.3d at 209).  Based on the arguments advanced in his brief, Petitioner must make two showings to satisfy this first requirement:  (i) the Panel found that Respondent had violated the NYLL and (ii) the Panel also rejected flatly Petitioner's equitable claims.

Petitioner has made neither showing.  Nothing in the parties' written or oral submissions to the Panel established that the NYLL was "clearly applicable" to the parties' dispute.  Indeed, the NYLL's applicability — more directly, whether the Reserve consisted of deductions from Respondent's wages — was a central point of contention during the Arbitration.  And in light of this ambiguity, the Court cannot conclude that Section 198's mandatory-attorney's-fees requirement "clearly applied" in the Arbitration.

On the other side of the coin, there is good reason to suspect that the Panel granted Petitioner equitable relief.  As noted, Petitioner left Respondent when his Reserve balance was $150,000.  Within weeks of Petitioner's departure, Respondent paid a $400,000 fine to FINRA in order to settle an ongoing regulatory investigation.  And during the Arbitration, Respondent's former and current CEO both testified (and Petitioner disputed) that Petitioner had orally agreed to contribute $100,000 of his Reserve to help pay that fine.

22

That would have left $50,000 in the Reserve, which is the precise amount of damages the Panel awarded Petitioner.

Petitioner is correct that a party cannot recover in quasi-contract if he has a binding agreement with the counterpart from whom he seeks recovery. *See, e.g.*, *Sugerman* v. *MCY Music World, Inc.*, 158 F. Supp. 2d 316, 326 (S.D.N.Y. 2001) (applying New York law).[7]  But the parties' testimony during the Arbitration suggested that they had *not* reached an agreement concerning Petitioner's purported obligation to contribute Reserve funds to pay the FINRA fine.  It is axiomatic that "[t]o create a binding contract, there must be a meeting of the minds as to the material terms of the agreement."  *Metro. Enterprises N.Y.* v. *Khan Enter. Const., Inc.*, 1 N.Y.S.3d 328, 329 (App. Div. 2d Dep't 2015).  Here, it is unclear whether Respondent and Petitioner ever orally agreed that Petitioner would contribute any portion of the Reserve to satisfy the FINRA fine.

All three of the equitable theories Petitioner pursued in the Arbitration — unjust enrichment, restitution, and quantum meruit — have analytically similar elements.  *See Mid-Hudson Catskill Rural Migrant Ministry, Inc.* v. *Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) ("Applying New York

---

[7]     In support of its argument that the Panel granted Petitioner equitable, not statutory, relief, Respondent cites two cases from this District that applied New York substantive law.  (Resp't Opp. 17).  Petitioner, making the opposite argument in his reply brief, also cites two federal district-court opinions applying New York law.  (Pet'r Reply 5).  Because there is no arbitration agreement in the record, the Court cannot say whether the parties agreed that New York substantive law would apply in the Arbitration.  But given that the parties appear to have proceeded on that assumption, the Court will do the same.

law, we may analyze quantum meruit and unjust enrichment together as a single quasi contract claim."); *Alan B. Greenfield, M.D., P.C.* v. *Long Beach Imaging Holdings,* 981 N.Y.S.2d 135, 137 (App. Div. 2d Dep't 2014) (quoting *Paramount Film Distrib. Corp.* v. *State*, 30 N.Y.2d 415, 421 (1972)) (restitution and unjust enrichment share same elements).  To recover unjust enrichment, for example, Petitioner would have had to show "that [i] [Respondent] was enriched, [ii] at [Petitioner's] expense, and [iii] that it is against equity and good conscience to permit [Respondent] to retain what is sought to be recovered." *Georgia Malone & Co.* v. *Rieder*, 19 N.Y.3d 511, 516 (2012) (citation omitted).  It would have been consistent with the parties' course of dealings for the Panel to determine that Petitioner had satisfied those three elements.  And it is thus entirely possible that the Panel awarded Petitioner $50,000 — i.e., the balance of the Reserve, minus Petitioner's proportional share of the FINRA fine — under an equitable theory of recovery.

At bottom, the Court is confident that "there is a *barely colorable justification* for" Section 1 and Section 2 of the Award.  *Telenor Mobile*, 584 F.3d at 407 (internal quotation mark omitted) (quoting *Buttar,* 378 F.3d at 190) (emphasis in *Buttar*).  Petitioner's speculations do not establish that the Panel awarded him damages under the NYLL.  And for that reason, his claim that the Panel manifestly disregarded Section 198 of the NYLL falls flat.  In sum, even assuming that Petitioner had timely served his Petition, his request for vacatur is meritless.

**B.    The Court Confirms the Award in Its Entirety**

The Court's refusal to vacate or modify Section 2 of the Award makes the final part of this Opinion straightforward.  Section 9 of the FAA commands that "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11."  *Hall St. Assocs., L.L.C.* v. *Mattel, Inc.*, 552 U.S. 576, 582 (2008) (quoting 9 U.S.C. § 9).  The parties identify no error in Section 1 of the Award, and the Court has concluded that Section 2 should stand.  Accordingly, the Court confirms the Award in full.

**CONCLUSION**

For the reasons set forth above, the Petition is GRANTED IN PART and DENIED IN PART, and the Award is CONFIRMED in full.  The Clerk of Court is directed to terminate all pending motions and close this case.

SO ORDERED.

Dated:       February 10, 2017
             New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge

25
